# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| NEW HAMPSHIRE INS. CO., | : | |
| | : | Civil Action No. |
| Plaintiff, | : | 07-cv-1131 (NLH) (JS) |
| | : | |
| v. | : | **AMENDED OPINION**[1] |
| | : | |
| WILLIAM DILLER, JR., | : | |
| | : | |
| Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| JAY KOPP, NIA GROUP ASSOC., | : | |
| LLC, and MANN CUSTOM BOATS, | : | |
| INC. | : | |
| Third-Party | : | |
| Defendants. | : | |

**APPEARANCES:**
MICHAEL E. STERN
JAMES E. MERCANTE
KEITH A. BRADY
RUBIN, FIORELLA & FRIEDMAN, LLP
292 MADISON AVENUE, 11TH FLOOR
NEW YORK, NY 10017
*Attorneys for New Hampshire Insurance Company*

SEAN T. O'MEARA
ARCHER & GREINER, PC
ONE CENTENNIAL SQUARE
HADDONFIELD, NJ 08033
*Attorney for William Diller, Jr.*

FREDERICK M. KLEIN
THE SULLIVAN LAW GROUP, LLP
744 BROAD STREET, 16TH FLOOR
NEWARK, NJ 07103
*Attorney for Jay Kopp and NIA Group Associates, LLC*

---

[1]   This Opinion and its accompanying Order were filed on December 23, 2009.  Here, the Opinion is amended to accurately reflect the appearances of counsel.  In all material respects, the Opinion remains unchanged.

LAWRENCE J. KAHN
MICHAEL CHARLES ELLIOTT
FREEHILL HOGAN & MAHAR, LLP
80 PINE STREET
NEW YORK, NY 10005
*Attorneys for Mann Custom Boats, Inc.*

**HILLMAN, District Judge**

This case presents the issue, among others, of whether an insurance company may draft and enter into a marine insurance contract with an insured which on its face allows it to void coverage for only intentional misrepresentations, and later, when the issue of intent is unclear, rely on a common law doctrine to deny coverage which deems intent irrelevant.  We conclude that it may not.

Plaintiff, New Hampshire Insurance Company ("NHIC"), filed a complaint against its insured, defendant/counter-claimant/third-party plaintiff, William Diller, Jr., requesting a declaratory judgment denying marine insurance coverage for damage to Diller's 60-foot vessel, "M/V Dream Catcher."  Diller counterclaimed against NHIC and also filed a third-party complaint against his insurance broker, John C. Kopp, Jr. (sued as "Jay Kopp"), and Kopp's employer, NIA Group Associates, LLC ("NIA").  Subsequently, Diller filed an amended third-party complaint in which he also named as a third-party defendant Mann Custom Boats, Inc. ("Mann"), the designer, manufacturer, and repairer of the vessel.

Presently before the Court are several motions: NHIC's

2

Motion for Summary Judgment; Kopp and NIA's (collectively "Kopp/NIA") Motion for Summary Judgment[2] and Motion on the Pleadings to Dismiss the Amended Third-party Complaint; and Diller's Cross-motion for Partial Summary Judgment on its Counterclaim and Motion for Leave to File a Sur-reply and Affidavit.  For the reasons explained below, NHIC's Motion for Summary Judgment, Kopp/NIA's Motion for Summary Judgment, and Diller's Cross-motion for Partial Summary Judgment are all denied.  However, Diller's Motion for Leave to File a Sur-reply is granted and Kopp/NIA's Motion to Dismiss will be granted with leave to re-file under certain conditions.

I.   **JURISDICTION**

This Court exercises subject matter jurisdiction over the underlying claim pursuant to 28 U.S.C. § 1332.  There is complete diversity between the plaintiff in the underlying action who is a citizen of the Commonwealth of Pennsylvania where it is incorporated and of New York where it has its principal place of business, and defendant/counter-claimant/third-party plaintiff

---

[2]   Kopp/NIA improperly denominated their motion as a "cross-motion" and the clerk has dutifully designated it as such. However, the motion was not filed in response to a motion seeking the same or similar relief filed by the party (Diller) against whom Kopp/NIA now moves.  As such, it is not a cross-motion but rather simply a motion.  Black's Law Dictionary 1106 (9th ed. 2009) (defining cross-motion as "[a] competing request for relief or orders similar to that requested by another party against the cross-moving party") (emphasis added).

who is a citizen of New Jersey.[3]  Plaintiff alleges that the amount in controversy exceeds $75,000.

## II.  BACKGROUND

Diller, who owned M/V Dream Catcher (the "vessel"), requested that NIA obtain a quote for marine insurance coverage for the vessel for the 2006-07 policy year.  Diller was a client of NIA, and Kopp, who was employed by NIA, had been Diller's insurance broker for several years.  To obtain a quote for Diller, Kopp filled out a request form on a website maintained by Maritime General Agency ("MGA"), the intermediary for NHIC.  Kopp stated in his affidavit that one of the fields on the MGA website requested information for the "number of claims in last 5 years."

After Kopp filled in the form on the MGA website, the information was electronically submitted to MGA.  The information was reviewed by Michael Terrier, an MGA underwriter.  On the basis of this information, MGA provided a quote and application for coverage from NHIC.  Kopp filled out the application

---

[3]     Under Fed. R. Civ. P. 14, it is not required that diversity of citizenship exist between the third-party defendant and the plaintiff, or that diversity of citizenship exist between defendant, as third-party plaintiff, and the third-party defendant.  See Spring City Corp. v. American Bldgs. Co., 193 F.3d 165, 169 (3d Cir. 1999) (stating that "a third-party defendant joined under Federal Rule of Civil Procedure 14 does not become a defendant as against the original plaintiff, so that federal jurisdiction is not destroyed where those parties are citizens of the same state") (citing Smith v. Philadelphia Transp. Co., 173 F.2d 721, 724 n. 2 (3d Cir. 1949)); In re Albert & Maguire Securities Co., Inc., 70 F.R.D. 361, 363 (E.D. Pa. 1976).

including information requesting "Loss History: (Date, Cause, Amount)."  At the center of this case is the absence of certain information from Diller's "Loss History," as well as other alleged misrepresentations or omissions relating to Diller's application.

Among the information absent from Diller's application to NHIC was an incident that occurred in February 2001.  Diller's vessel was involved in a "grounding," for which the vessel's insurer at the time paid $115,000.  Also as a result of that accident, a mate on the vessel suffered a personal injury, resulting in a $3,000 claim.

Second, Kopp stated on the application that in December 2002, Diller's vessel hit an object and that the amount paid for that accident was $19,000.  In an insurance application to CIGNA Insurance Company dated July 16, 2003,[4] however, the amount paid as a result of the December 2002 incident was listed as $32,000.[5]

Third, in August 2004, the vessel, with Diller aboard,

---

[4]    Diller states that, like the application submitted to NHIC, the insurance application submitted to CIGNA also was completed on his behalf by Kopp.

[5]    NHIC alleges that, based on Kopp's deposition testimony, the actual total amount of damages sustained during the December 2002 incident was $44,000.  In response, Diller suggests that Kopp was confused about the total gross amount of damages and whether those damages, including a $12,000 deductible, equaled $32,000 or $44,000.  Kopp/NIA concede that Kopp mistakenly misrepresented the amount as $19,000, rather than $32,000, on the application to NHIC, but assure that the mistake was unintentional.

suffered damage to its hull and began taking on seawater, forcing the crew to radio a "Mayday" distress call.  The vessel was escorted to port by the United States Coast Guard and was later repaired by Mann.  This casualty was not reported on the application.

Fourth, on the application Kopp checked off the "Licensed Capt." box based on information from Diller that the vessel was being operated by a licensed captain.  Diller, however, admits that he is not a licensed captain, but reports that he employed Michael Bennett, who is a licensed captain.

Finally, the total horsepower of the vessel's engine as indicated on the application was "1350."  Its actual horsepower was approximately 2,700.

After filling in the application, Kopp forwarded it to Diller with instructions for Diller to sign it and return it to Kopp with a check for the insurance premium due.  Diller stated that after reviewing the application he noticed that the February 2001 and August 2004 incidents were not reported on the application.  Diller asked Kopp why they were excluded.  With regard to the February 2001 incident, Kopp replied that he understood the application's request for "Loss History" to be asking for any claims made within the past five years, just as the MGA website form had requested.  By Kopp's estimation, the February 2001 incident occurred more than five years prior to completing the current application to NHIC and, therefore, did

6

not have to be reported.[6]  Further, Kopp said that the August
2004 incident did not have to be disclosed because Diller did not
pursue an insurance claim in relation to it.[7]  In June 2006,
Diller signed the application, which was forwarded by Kopp to
NHIC.  Shortly thereafter, NHIC issued a policy for the vessel
for the period of June 29, 2006 through June 29, 2007.

On August 9, 2006, while participating in a fishing contest
in the Atlantic Ocean, the vessel's hull was damaged.  Diller
submitted a claim to NHIC for coverage of this accident.  NHIC
began an investigation of Diller's claim and, on October 20,
2006, took his examination under oath ("EUO").

During the EUO, Diller was asked whether he had suffered any
losses with his vessel other than the December 2002 claim.
Diller answered yes, and recalled the August 2004 incident.  When
asked if he had submitted an insurance claim to his previous
marine insurer in connection to the August 2004 claim, Diller
replied that he had not.  However, Diller acknowledged that he

---

[6]     During his deposition, Kopp stated that he did not
recall having any conversations with Diller around the time the
application was completed regarding the February 2001 and August
2004 incidents.  In particular, Kopp added:  "To the best of my
knowledge [those conversations] did not take place."
Nevertheless, Kopp and Diller share the same explanations for the
exclusion of the incidents from the application.

[7]     Having determined that the actual cost of damages --
approximately $14,000 -- would be less expensive than his
insurance policy's deductible, Diller paid for the damages
resulting from the August 2004 incident out of his own pocket.

had told Kopp of the incident and did not know whether Kopp had reported it to the insurer.  Documentation indicates that the August 2004 incident was reported to Diller's insurer at that time, but the claim was later withdrawn.

In a letter dated March 8, 2007, NHIC denied Diller coverage on the grounds that, in violation of his NHIC policy, Diller "intentionally concealed and/or misrepresented material facts" in his insurance application and his EUO.  Specifically, NHIC refused to cover Diller's loss because, in his application, he failed to disclose the February 2001 and August 2004 incidents and failed to disclose the full amount of damages suffered during the December 2002 incident.  The letter also denied coverage because Diller had marked off "Licensed Capt." on his application even though he was not a licensed captain.  In addition, NHIC submitted that Diller misrepresented material facts during the EUO by failing to mention the February 2001 incident and by denying that he had filed an insurance claim in connection to the August 2004 incident.  Finally, NHIC denied coverage on the determination that the vessel was not seaworthy either at the inception of the policy or on the August 9, 2006 voyage.

NHIC filed a complaint requesting that this Court enter judgment declaring that no coverage is afforded for any claims arising out of the August 9, 2006 incident; that the policy is void ab initio; that the policy is rescinded; and that NHIC is

8

entitled to reimbursement of costs and expenses relating to the storage, survey, salvage, and hauling of the vessel in connection with the August 9, 2006 incident.  On May 1, 2007, Diller filed a counterclaim against NHIC for a declaratory judgment as to coverage of the vessel, and for breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, bad faith, and estoppel.  Diller also filed a third-party complaint against Kopp/NIA for negligence, breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty.[8]  On January 8, 2008, Diller filed an amended third-party complaint also naming Mann as a third-party defendant.  Along with designing and manufacturing the vessel, Mann also made repairs to the vessel before the August 9, 2006 accident.

In an opinion dated June 30, 2008, this Court addressed Kopp/NIA's previous motion for summary judgment.  At that stage of the litigation, this Court rejected Kopp/NIA's arguments that Diller's alleged misrepresentations during his EUO constituted an independent basis for Diller's loss or that his review and signature on the written insurance application relieved Kopp/NIA of any liability.[9]

---

[8]    Diller included a claim based on <u>respondeat superior</u> which is a legal doctrine, not a cause of action.

[9]    In the opinion, this Court also affirmed the viability of Diller's third-party claim against Kopp/NIA for breach of

NHIC now moves this Court for summary judgment, seeking to deny Diller coverage and to void the insurance contract <u>ab initio</u>.  Although not directed at them, Kopp/NIA oppose NHIC's motion[10] and submit their own motion for summary judgment against Diller, requesting the dismissal of Diller's claims against them.  Alternatively, Kopp/NIA have also filed a motion to dismiss Diller's third-party complaint on the basis that he failed to submit an Affidavit of Merit as prescribed by N.J.S.A. 2A:53A-26.  Finally, Diller, relying on Kopp/NIA's motion for summary judgment, cross-moves for partial summary judgment against NHIC and also submits a motion for leave to file a sur-reply to Kopp/NIA's motion to dismiss.

## III. DISCUSSION

Presently before the Court are NHIC's Motion for Summary Judgment, Kopp/NIA's Motion for Summary Judgment and Motion to Dismiss on the Pleadings, and Diller's Cross-motion for Partial Summary Judgment and Motion for Leave to File a Sur-reply and Affidavit.  The Court will address each motion in turn.

### A.   Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and

---

fiduciary duty.  However, Diller's claim for breach of the covenant of good faith and fair dealing and his demand for punitive damages were voluntarily dismissed.

[10]     Mann, on the other hand, supports NHIC's motion.

10

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and

11

affirmative evidence that contradict those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001)

    **B.   NHIC's Motion for Summary Judgment**

NHIC moves this Court to rule in its favor on summary judgment, arguing that Diller, in completing his insurance application and testifying during his EUO, failed to disclose casualties involving his vessel that occurred during February 2001 and August 2004, misrepresented the amount of damage his vessel suffered as a result of the December 2002 incident, identified himself as a licensed captain even though he is not, and misrepresented his vessel's horsepower.[11]  According to NHIC, no genuine issue of material fact exists to refute Diller's knowing concealment and misrepresentation on which NHIC relied when extending insurance coverage to his vessel.  NHIC submits that Diller's concealment and misrepresentation of material facts breach his duty of utmost good faith under the federal admiralty doctrine of <u>uberrimae</u> <u>fidei</u>, constitute equitable fraud under New Jersey law, and violate the terms of his policy, thereby voiding

---

[11]    Mann supports NHIC's Motion for Summary Judgment and echoes many of the same arguments advanced by NHIC.

12

coverage.[12]

Diller (as well as Kopp/NIA) opposes NHIC's Motion for Summary Judgment, arguing that genuine issues of material fact exist with regards to whether they intentionally concealed or misrepresented certain information, whether any information was misrepresented at all, and whether the absent information was material and, thus, pertinent to NHIC's decision to insure Diller's vessel.  Diller contends that the language of NHIC's policy circumvents the doctrines of uberrimae fidei and equitable fraud and enables NHIC to void the insurance contract only if any material information was "intentionally" concealed or misrepresented -- a high threshold, they suggest, which cannot be demonstrated here.  Alternatively, even if Diller and Kopp/NIA misrepresented or omitted certain facts, they submit that the information was not material and that NHIC did not rely on it in issuing Diller a quote and deciding to provide him with insurance.

### 1.   Doctrine of **Uberrimae Fidei**

Recently, the Third Circuit Court of Appeals affirmed the doctrine of uberrimae fidei as federal admiralty law "well entrenched" within our Circuit's precedent and, thus, applicable

---

[12]   NHIC's Motion for Summary Judgment is limited to these legal issues.  Thus, NHIC expressly "reserves its other policy defense at this time, including the breach of warranty of seaworthiness of the Vessel."

to and controlling maritime insurance contracts.  <u>AGF Marine Aviation & Transp. v. Cassin</u>, 544 F.3d 255, 263 (3d Cir. 2008).  "The doctrine of <u>uberrimae</u> <u>fidei</u> imposes a duty of the utmost good faith and requires that parties to an insurance contract disclose all facts material to the risk."  <u>Id.</u> at 262.  If an insured fails to disclose all material facts, the insurer may void the contract.  <u>Id.</u>  Moreover, "[a] party's intent to conceal, or lack thereof, is irrelevant to the <u>uberrimae</u> <u>fidei</u> analysis."  <u>Id.</u>  In other words, it is of no moment whether the insured breaches its duty to disclose by virtue of calculated deceit or by innocent mistake; the insured's failure to disclose voids the contract and its coverage.  <u>Id.</u>

Because maritime insurance is at issue in this case, NHIC argues that the doctrine of <u>uberrimae</u> <u>fidei</u> controls and necessitates summary judgment against Diller on account of his alleged misrepresentations and non-disclosures, as further described above.  Diller counters that his insurance policy with NHIC embodies a contractual agreement between the parties which, by its express terms, modifies <u>uberrimae</u> <u>fidei</u> and permits NHIC to void the policy only if Diller <u>intended</u> to misrepresent or omit material facts.[13]  For that reason, posits Diller, NHIC must

---

[13]    Under the "GENERAL CONDITIONS AND EXCLUSIONS" section of NHIC and Diller's "Yacht Policy," it reads:

        10. CONCEALMENT OR MISREPRSENTATION:
        Any relevant coverage(s) shall be voided if

14

demonstrate Diller's intent to misrepresent and conceal material facts in the application or during the post-loss investigation, a burden it cannot carry on summary judgment.

Therefore, essential to the disposition of the pending motion is in what way, if at all, a marine insurer and a marine insured may contractually abandon, modify, or otherwise circumvent the doctrine of _uberrimae_ _fidei_.  On this point, conflicting authority exists.

In support of its argument that parties cannot contract around the doctrine of _uberrimae_ _fidei_ without explicitly stating their intent to do so, NHIC points to the recent opinion in _New Hampshire Insurance Co. v. C'est, Moi, Inc._, 519 F.3d 937 (9th Cir. 2008), _cert. denied_, 129 S. Ct. 639 (2008).  In that case, the district court found that the insured misrepresented on its application to the insurer material facts pertaining to its yacht.  _Id._ at 938.  As a result, the court granted summary judgment to the insurance company and rescinded the policy.  _Id._

On appeal, the insured argued that the policy's provision concerning misrepresentations lowered its _uberrimae_ _fidei_ obligation, thereby permitting rescission only if the insured misrepresented a material fact intentionally and not by accident

---

you intentionally conceal or misrepresent any
material fact or circumstance relating to
this insurance, or your insurance
application, before or after a loss.

15

or mistake.  Id.  Acknowledging the issue as "an open question in this circuit," the Ninth Circuit Court of Appeals, nevertheless, concluded that were it possible to contract around uberrimae fidei in an insurance policy, the modification would "certainly require very clear policy language, unequivocally disclosing a mutual intent to supersede the insured's common law obligation." Id. at 938-39.  Clear and unambiguous language is necessary, the Ninth Circuit reasoned, to ensure the uberrimae fidei doctrine's objective of protecting insurers and "the integrity of the risk pool."  Id. at 939.  Turning its attention to the parties' policy,[14] the Ninth Circuit rejected the insured's argument that the challenged provision substituted a different standard by which to adjudicate its misrepresentations.  Id.  Rather, the Circuit Court found that the provision did not remotely reference uberrimae fidei or "purport to supersede other rights and responsibilities that the parties may have vis-a-vis each other by operation of law."  Id.

---

[14]    The contractual provision at issue in C'Est Moi is identical to the language at issue in this case:

> 10.  CONCEALMENT OR MISREPRESENTATION:
>
> Any relevant coverage(s) shall be voided if you intentionally conceal or misrepresent any material fact or circumstance relating to this insurance, or your insurance application, before or after a loss.

Id. at 938.

Contrary to NHIC's reliance on the Ninth Circuit's interpretation in C'Est Moi, Diller and Kopp/NIA highlight King v. Allstate Insurance Company, 906 F.2d 1537 (11th Cir. 1990). In King, an insurance company denied coverage on the insured's sunken yacht because, during the application process, the insured allegedly misrepresented material information regarding the yacht's purchase price and value, prior insurance, and prior insurance loss. Id. at 1538. The insured sued the company in an effort to secure coverage, but the jury returned a verdict in the company's favor. Id. As part of its instructions to the jury, the district court explained that under the parties' agreement, a policy is voidable only if the insured intentionally misrepresented a material fact during the application process. Id. at 1539. The court, nevertheless, instructed the jury as to both the policy's terms and federal maritime law, which, contrary to the policy and state law, does not require any intent to misrepresent to render a contract voidable. Id. at 1538-39.

On appeal, the insured contested the district court's jury instruction which set forth both federal maritime law and the policy's terms, asserting that the policy alone governed the issue of misrepresentations and omissions made during the application process. Id. at 1539-40. In response, the Eleventh Circuit Court of Appeals held: "It is clear that parties are free to 'contract-out' or 'contract around' state or federal law with

17

regard to an insurance contract, so long as there is nothing void as to public policy or statutory law about such a contract."[15] Id. at 1540.  The panel added that "[t]here being no public policy problem whatsoever in parties to a maritime insurance contract setting the terms of the policy between them, we uphold their freedom to do so."  Id. at 1541.  Therefore, the panel concluded that "the parties contracted for their own standard to show misrepresentations or omission" and that the district court erred by instructing the jury on federal maritime law.  Id. at 1542.

Illustrated by the opinions of the Ninth and Eleventh Circuits, there is a conflict of authority as to how, if at all, a marine insurer and a marine insured, through a policy provision, may supplant or alter the federal admiralty doctrine of uberrimae fidei.  Where a maritime dispute arises, a court in the Third Circuit must determine whether "well established principles of federal admiralty law" exist and, if so, must apply those principles "to resolve [the] dispute."  AGF Marine Aviation & Transp., 544 F.3d at 260 n.4 (citing Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 313 (1955)).  If, however, no "well established principles" exist, the court must "apply

---

[15]    The dissent in King concluded that the doctrine of uberrimae fidei must govern marine insurance contract disputes absent a clear and unambiguous statement providing otherwise. See King, 906 F.2d at 1543-46 (Johnson, J., dissenting).

state law as the federal rule of decision." Id. (citing Wilburn
Boat, 348 U.S. at 313); see Calhoun v. Yamaha Motor Corp., 40
F.3d 622, 627 (3d Cir. 1994) ("State and federal authorities
jointly exercise regulatory authority over maritime matters.  As
a result, state law can, and often does, provide the relevant
rule of decision in admiralty cases." (citation omitted)).
"Whether a state law may provide a rule of decision in an
admiralty case depends on whether the state rule 'conflicts' with
the substantive principles of federal admiralty law." Calhoun,
40 F.3d at 627.

In AGF Marine Aviation & Transport, the Third Circuit
discerned that, in spite of a circuit split, the doctrine of
uberrimae fidei in general is "well entrenched" jurisprudence
because of its overwhelming acceptance in the majority of
circuits and its previous application to maritime insurance
contracts in the Third Circuit.  AGF Marine Aviation & Transp.,
544 F.3d at 262-63.  However, under what circumstances, if any,
parties to a maritime contract may modify or cancel the uberrimae
fidei obligation does not seem to enjoy the same widespread
consensus nor has the Third Circuit, in AGF Marine or any other
decision, directly addressed it.[16]  The absence of a decision of

---

[16]     The court's decision in AGF Marine did not require it
to resolve a conflict between the parties' contractual language
and an overarching principle of federal common law.  On the
contrary, the parties agreed in the policy itself that any
disputes over the contract were to be resolved applying "United

the Third Circuit addressing this precise issue, and
diametrically opposed decisions from the two circuits that have,
render it difficult for this Court to conclude that an absolute
bar on a contractual modification of uberrimae fidei is a "well
established principle[] of federal admiralty law."[17]   Id. at 260
n.4.  We conclude, therefore, that New Jersey law must determine
whether the "CONCEALMENT OR MISREPRESENTATION" provision in NHIC
and Diller's policy modifies the doctrine of uberrimae fidei and
only enables NHIC to void the policy if Diller "intentionally"
concealed or misrepresented a material fact.[18]   See Conn. Indem.
Co. v. Perrotti, 390 F. Supp. 2d 158, 166-67 (D. Conn. 2005)
(applying state law to interpret marine insurance policy and
finding that parties contracted around uberrimae fidei by

---

States Federal Admiralty law."   Id. at 260 n.4.

[17]   We note here the irony inherent in NHIC's argument that
the general principle of uberrimae fidei should trump the
parties' contractual language.  On the one hand, NHIC argues that
Diller has an absolute obligation of accuracy regardless of
intent.  On the other hand, NHIC argues that it may supply
contractual language that would appear to limit rescission to
intentional misrepresentation (and thereby expand coverage) and
at the same time still void the contract (and thereby deny
coverage) based on a lighter burden sounding in common law and
found nowhere in the agreement itself.  Even the inherently harsh
doctrine of uberrimae fidei itself places the same high standard
of utmost good faith on both parties.  AGF Marine Aviation &
Transp., 544 F.3d at 265 n.8 (noting that uberrimae fidei
requires the utmost good faith of both insured and insurer).

[18]   None of the parties -- NHIC, Diller, or Kopp/NIA --
disputes that if federal admiralty law does not resolve this
case, New Jersey law should apply.

agreeing that only intentional concealment and misrepresentation may void policy); Progressive N. Ins. Co. v. Bachmann, 314 F. Supp. 2d 820, 829-30 (W.D. Wi. 2004) (applying state law to interpret marine insurance policy, in part, because, consistent with state law, parties agreed that only a "knowing" misrepresentation would void policy).

### 2. Intentional Concealment and Misrepresentations

Pursuant to New Jersey law, a court should look to the plain language of an insurance policy and accord any clear and unambiguous terms in the policy their ordinary meanings as written. Villa v. Short, 947 A.2d 1217, 1222 (N.J. 2008); Longobardi v. Chubb Ins. Co., 582 A.2d 1257, 1260 (N.J. 1990). If, however, a policy's terms or provisions are ambiguous, they should be construed in favor of the insured to sustain coverage. Villa, 947 A.2d at 1222 ("[I]f the policy language fairly supports two meanings, one that favors the insurer, and the other that favors the insured, the policy should be construed to sustain coverage." (citation and internal quotation marks omitted)); Zacarias v. Allstate Ins. Co., 775 A.2d 1262, 1264 (N.J. 2001) ("When there is ambiguity in an insurance contract, courts interpret the contract to comport with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning."). Particular to concealment or misrepresentation clauses in insurance policies,

"the law disfavors forfeitures" and, thus, "such clauses should be construed if possible to sustain coverage." <u>Longobardi</u>, 582 A.2d at 1260.

In this case, the "CONCEALMENT OR MISREPRSENTATION" clause in NHIC and Diller's policy provided:  "Any relevant coverage(s) shall be voided if you <u>intentionally</u> conceal or misrepresent any material fact or circumstance relating to this insurance, or your insurance application, before or after a loss."  (Emphasis added).  Mindful of those rules of construction set forth above, a plain reading of the clause's terms reveals that the word "intentionally" qualifies both "conceal" and "misrepresent."  <u>See Clarendon Nat'l Ins. Co. v. Ins. Co. of the West</u>, 442 F. Supp. 2d 914, 924-25 (E.D. Cal. 2006) (construing similar phrase in insurance policy and finding that "'intentional'" modifies both "'concealment'" and "'misrepresentation'"), <u>aff'd</u>, 290 Fed. Appx. 62 (9th Cir. 2008); <u>Tri-State Ins. Co. v. H.D.W. Enter., Inc.</u>, 180 F. Supp. 2d 1203, 1217 (D. Kan. 2001) (same).  Therefore, based on the provision's clear and unequivocal language and given a reasonable interpretation favoring coverage and the reasonable expectations of the insured, NHIC may void the policy only if Diller or Kopp concealed or misrepresented a fact, which they knew to be material, with an intent to deceive.  To construe the clause as requiring intent to conceal or misrepresent is an interpretation consistent with that of other courts who have had

to parse insurance policies with similar liability provisions.[19]
See, e.g., King, 906 F.2d 1537 ; Conn. Indem. Co., 390 F. Supp.
2d at 166-67; Progressive N. Ins. Co., 314 F. Supp. 2d at 829-30.

    With the applicable law in mind, the Court turns to the
particular facts in this case.

        **a.    February 2001 and August 2004 Incidents**

    It is undisputed that Diller and Kopp did not disclose in
Diller's insurance application to NHIC that his vessel was
involved in and damaged during casualties which occurred in

---

    [19]    NHIC correctly underscores that in New Jersey an
insurer may void a contract when the insured has committed
equitable fraud.  See F.D.I.C. v. Moskowitz, 946 F. Supp. 322,
329 (D.N.J. 1996).  Like uberrimae fidei, the doctrine of
equitable fraud generally does not require any demonstration of
the insured's intent to deceive and, for that reason, permits
rescission of an insurance contract even on the basis of an
insured's innocent misrepresentations.  See Ledley v. William
Penn Life Ins. Co., 651 A.2d 92, 95 (N.J. 1995).  However, apart
from any persuasive weight afforded the Ninth Circuit's decision
in C'Est Moi, NHIC proffers no case law specifically suggesting
that common law doctrines such as uberrimae fidei and equitable
fraud may not be modified or superseded by a contractual
agreement between the insurer and the insured.  On the contrary,
as we have noted, a number of courts have embraced the ability of
parties to contract around common law.  See, e.g., King, 906 F.2d
at 1540-41; Conn. Indem. Co., 390 F. Supp. 2d at 166-67;
Progressive N. Ins. Co., 314 F. Supp. 2d at 829-30; see also,
e.g., McBride v. Hartford Life & Accident Ins. Co., 2007 U.S.
Dist. LEXIS 16917, at **64-65 (E.D. Pa. Jan. 29, 2007) (holding
that insurance application clause modified federal common law
governing misrepresentations because "'once an insurer has
entered into a policy by using an application form more favorable
to the insured than the law provides, it may not rely on a rule
of law which is more stringent than the application form.'"
(quoting Espinosa v. Guardian Life Ins., 856 F. Supp. 711, 717
(D. Mass. 1994))).

February 2001 and August 2004.  NHIC argues that Diller knew of these material facts but failed to disclose them even though the application unambiguously asked for "Loss History: (Date, Cause, Amount)."

In response, Diller and Kopp submit that their omissions of the February 2001 and August 2004 incidents were not part of an intentional ploy to deceive NHIC, but rather were based on reasonable interpretations of the application's request.  In failing to include the February 2001 incident on the application to NHIC, Kopp, who completed the form on Diller's behalf, states that he understood the application's request for "Loss History" as inquiring about any claims made within the past five years, as requested on the MGA website form.  Because the February 2001 incident occurred more than five years prior to the application's completion in June 2006, Kopp did not mention it.  As for the August 2004 incident, Kopp states that it was not reported as part of the vessel's loss history because Diller withdrew from his insurance carrier any claims relating to it.  Diller adds that the incident did not result in an insurance loss because he paid for the damages himself.

Assuming arguendo that Diller and Kopp did not properly respond to the loss history inquiry on the application, a genuine issue of material fact still remains.  Even if the application's plain language compelled disclosure of the February 2001 and

24

August 2004 incidents, NHIC can void the contract only if Diller and Kopp "intentionally" concealed or misrepresented those facts. It is undisputed that they had knowledge of the casualties, but both claim that their failures to disclose were not animated by an intent to deceive but rather by an innocent misunderstanding of the application's request.  See C'Est Moi, Inc., 519 F.3d at 940 (noting that insured's confusion between a quote request form's inquiry about the "previous insurer" and an insurance application's inquiry about the "present insurer" could "show that [the insured's] misrepresentation wasn't intentional"). Therefore, a fact finder must evaluate the parties' credibility to determine whether Diller and Kopp harbored the requisite intent to misrepresent or conceal to permit NHIC's rescission of the policy.[20]  For that reason, summary judgment is inappropriate at this time.  See Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007) ("Issues such as intent and credibility are rarely suitable for summary judgment.").

> **b.    Amount of Damage Suffered in December 2002 Incident**

It is undisputed that Diller and Kopp stated in Diller's

---

[20]    NHIC points out that during a telephone call, and as memorialized in an e-mail, Kopp informed an NHIC claims handler that Diller's vessel suffered a loss in August 2004 even though the casualty was not mentioned on the application.  In his deposition, Kopp acknowledges that the August 2004 incident may have been something that an insurance company would have wanted to know when evaluating a risk.  This admission may prove germane to a fact finder considering the issue of intent.

application to NHIC that the amount paid as a result of the vessel's December 2002 incident was $19,000.  NHIC argues that the amount paid was represented as $32,000 in applications to prior insurers and is actually $44,000.  According to NHIC, Diller knowingly misrepresented this figure in his application to NHIC.  Diller contends that, as reflected by Kopp's deposition testimony, Kopp was confused whether the insurance "loss" associated with the December 2002 incident was $32,000 after discounting the $12,000 deductible that Diller paid or was $19,000 after subtracting the deductible.

During his deposition, Kopp affirmed that as a result of the December 2002 incident, "$32,000 was paid."  When asked if the gross claim submitted to the insurer was $44,000, Kopp replied, "Correct."  Later, Kopp acknowledged that in previous insurance applications he had represented the amount paid for the December 2002 incident as $32,000, but that in a subsequent application, he represented the amount as $19,000.  At Kopp's deposition, the following exchange occurred between Kopp and an opposing attorney:

> Q.      What's the reason now that the loss,
> the amount paid . . . now is reflected as
> 19,000 versus the 32,000 you have been
> disclosing to six other underwriters?
> Were you trying to minimize the extent of
> that casualty to try to get Mr. Diller
> coverage?
>
>         . . . .

A.          I can't answer that question.

Q.          Is that another Jay Kopp mistake?

A.          It could have be[en] a mistake.  I could have taken the 32,000 and made the assumption that it was a 12,000 deductible and to subtract those numbers.  I cannot answer that question.

Q.     . . . You had disclosed this loss to insurance companies six different times of 32,000.  Two years later you change the amount.  Why?

A.          I can't answer that question.  I don't know why.  I don't have a specific recollection of that.  My only assumption is that I would have taken the 32,000, assuming that it was a gross loss and subtracted the deductible.

Q.          That's what you did two years ago when you deducted the gross amount of 44,000, which you said was the extent of the casualty to reach 32,000; isn't that right, sir?  Isn't that how you reached the figure 32,000 by doing the mathematics and deducting the deductible from the gross amount of the claim?

                    . . . .

A.     You're correct.

In his deposition and affidavit, Kopp stated that the $19,000 figure was a mistake and not an intentional misrepresentation.

From Kopp's deposition testimony and affidavit, it is reasonably clear that, with regard to the December 2002 incident, Diller and Kopp misrepresented the amount paid by the insurer as $19,000 when the actual amount was about $32,000.  However, given the confusion surrounding the claim's gross amount and the amount

27

actually paid by the insurer, sans the deductible, there is a genuine issue of material fact whether any misrepresentations by Diller or Kopp were intentional or, as Kopp asserts, merely mistaken.  That Kopp purportedly represented the amount paid as $32,000 to six other underwriters who ultimately refused to issue a quote for Diller's vessel may support the inference endorsed by NHIC -- Kopp intentionally misrepresented the amount to NHIC in hopes of finally securing coverage for Diller.  Reasonable as that interpretation may be, it is the fact finder who must make that determination.

### c.    "Licensed Capt."

It is undisputed that on Diller's application to NHIC, in a section entitled "Personal" and in response to an inquiry labeled "Education," Diller and Kopp checked off the box marked "Licensed Capt."  It also is undisputed that Diller is not a licensed captain but did employ Michael Bennett, a licensed captain who was listed on the application in the section titled "NAMED OPERATORS."  NHIC argues that Diller knowingly misrepresented that he was a licensed captain.  In response, Diller and Kopp contend that they affirmed "Licensed Capt." only because Bennett was a licensed captain and was employed to operate the vessel.

Again, notwithstanding the reasonableness of Diller and Kopp's interpretation of the application, a genuine issue of material fact exists as to whether Diller and Kopp's

misrepresentation was intentional or merely a mistake inspired by an innocent misinterpretation of one of the application's queries.

### d.   Vessel's Horsepower

It is undisputed that on Diller's application, Diller and Kopp indicated that the vessel's horsepower was "1350."  Diller admits that the vessel's actual horsepower was about 2,700. Diller and Kopp do not contest that the application misrepresented the horsepower, but instead argue that the misrepresentation was not intentional nor material.  Diller and Kopp point to the fact that NHIC's reasons for voiding the policy, as expressed in the termination letter, did not include the misrepresentation of horsepower.

The Court agrees with NHIC that a misrepresentation of the vessel's horsepower is not immaterial simply because NHIC learned of it after NHIC already had voided the policy.  However, because the discrepancy over horsepower was not known at the time that NHIC refused to cover Diller and was not cited in the termination letter as a reason for denying coverage, there is a genuine issue of material fact as to the materiality of the vessel's excessive horsepower.  See N. Am. Speciality Ins. Co. v. Bader, 58 F. Supp. 2d 493, 499 (D.N.J. 1999) (finding that "there are genuine issues of material fact as to the language of the policy and the materiality of the excessive boat horsepower").

### e.   EUO Statements

It is undisputed that during his EUO, Diller testified that he did not file an insurance claim with his previous insurer concerning the August 2004 incident.  Because documentation demonstrates that an insurance claim was filed with Diller's previous insurer, NHIC argues that Diller knowingly misrepresented that a claim had not been filed.  On the contrary, Diller asserts that he accurately testified that he had not filed a claim and did not know whether Kopp had filed a claim in regards to the August 2004 incident.  Kopp admitted that he filed the claim.

In addition, it is undisputed that during his EUO, the February 2001 incident was not in any way discussed or mentioned. Having inquired at the EUO about any prior losses, NHIC argues that Diller knowingly concealed information about the February 2001 incident.  On the other hand, Diller asserts that in response to NHIC's question about prior losses, he began with the August 2004 incident and was not offered another opportunity during which he could have mentioned the February 2001 incident.

The EUO testimony was taken as part of NHIC's investigation following Diller's August 2006 loss involving his vessel. Therefore, to the extent that Diller's EUO statements constitute misrepresentations, they are post-loss misrepresentations.  "For an insurer to void a policy because of a post-loss

30

misrepresentation, the misrepresentation must be knowing and material." Longobardi, 582 A.2d at 1261. "A mere oversight or honest mistake will not cost an insured his or her coverage; the lie must be wilful." Id. Even assuming that Diller misrepresented or concealed information pertaining to the August 2004 insurance claim or the February 2001 incident, there is a genuine issue of material fact whether any such misrepresentation or concealment constituted an intentional, wilful lie.

As part of his EUO, Diller denied submitting an insurance claim for the August 2004 incident, but acknowledged that he told Kopp about the casualty and was unsure whether Kopp had reported it to the insurer.  Consistent with Diller's account, Kopp admitted in his deposition that he had filed a claim relating to the August 2004 incident.  With regard to the February 2001 incident, Diller offers a plausible explanation for his failure to disclose, which at least raises a factual dispute as to whether he intended to conceal that accident.

For the foregoing reasons, NHIC's Motion for Summary Judgment is denied.[21]

---

[21]   This Court's determination that material issues of fact remain regarding the intent of the insured and the materiality of his statements should not be misunderstood as a determination that the Court, if sitting as a fact finder, would have deemed the insured's explanations credible.  A reasonable jury may ultimately conclude that the timing of this loss is highly suspicious and that a series of "mistaken" representations are unlikely to be unintentional.  However weak, as long as some evidence exists to support the party's position, these issues are

**C.   Kopp/NIA's Motion for Summary Judgment**

Kopp/NIA move for summary judgment against Diller, arguing that Kopp's allegedly negligent completion of the insurance application submitted to NHIC did not proximately cause NHIC to deny insurance coverage to Diller.  In particular, Kopp/NIA assert that NHIC, namely Michael Terrier, the MGA underwriter who handled Diller's application to NHIC, did not rely on the application when issuing the policy to Diller.  According to Kopp/NIA, NHIC relied exclusively upon the MGA website form to rate the risk for Diller's vessel and in deciding to offer insurance and a premium quote.  The minimal significance accorded the insurance application in dispute is further evinced, says Kopp/NIA, by the fact that Terrier spent little time reviewing the application before finalizing the policy and that MGA's internal underwriting guidelines do not necessarily support Terrier's self-serving deposition testimony averring that Diller's alleged misrepresentations and omissions were material to the decision to furnish insurance.[22]  NHIC counters that its

---

for the jury and not the Court.

[22]     Diller cross-moves for partial summary judgment against NHIC, concluding that if Kopp/NIA succeed on their Motion for Summary Judgment -- and, thus, demonstrate that NHIC did not rely on the insurance application when deciding to issue Diller an insurance policy -- he, in turn, must prevail against NHIC.  In support of his motion, Diller relies on the arguments set forth by Kopp/NIA.

reliance on the insurance application -- and Diller's
misrepresentations and omissions -- is demonstrated by documents,
such as the quote itself, and testimonial evidence, including
that of Terrier and Kopp.

"The question of materiality must be viewed from the
perspective of a reasonable person in the insured's position."
AGF Marine Aviation & Transp., 544 F.3d at 264; cf. Ledley v.
William Penn Life Ins. Co., 651 A.2d 92, 638 (N.J. 1995) ("A
misrepresentation is material if it naturally and reasonably
influenced the judgment of the underwriter in making the contract
at all, or in estimating the degree or character of the risk, or
in fixing the rate of premium." (citation and internal quotation
marks and brackets omitted)).  In AGF Marine Aviation &
Transport, the Third Circuit addressed two standards for
determining the materiality of misrepresentations in a maritime
insurance policy.  The Court rejected the Second Circuit's
construction of materiality -- i.e., "'something which would have
controlled the underwriter's decision to accept the risk'" -- as
"too narrow."  AGF Marine Aviation & Transp., 544 F.3d at 264-65
(quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir.
1986)).  At the same time, the Court held that it did not have to
accept the Ninth Circuit's broad interpretation of materiality --
i.e., "'[t]he fact that the insurer has demanded answers to
specific questions in an application for insurance is in itself

33

usually sufficient to establish materiality as a matter of law'"
-- to resolve the dispute before it.  Id. (quoting Freeman v.
Allstate Life Ins. Co., 253 F.3d 533, 536 (9th Cir. 2001)).

Similarly, this Court need not adopt the Ninth Circuit's
broad approach to materiality to find that, as a matter of law, a
number of Diller's alleged misrepresentations and omissions were
material to the decision of NHIC and MGA to issue an insurance
policy to Diller.  Although Terrier's initial assessments may
have been based on only the MGA website form, Terrier testified
that he reviewed and relied on the application Kopp submitted on
Diller's behalf when deciding to insure Diller and to provide him
with a quote.[23]  If he were aware of Diller's misrepresentations
and omissions on the application, Terrier submits that he would
have declined to underwrite Diller's vessel or, at least, would
have raised the quote.  Accordingly, Terrier concludes that the
application, and not just the MGA website form, was pertinent to
his assessments.[24]

_____

[23]   Terrier stated that he gave Diller premium credits, or
discounts, based on Diller's representations that the vessel had
just one accident, in December 2002, and that Diller himself was
a licensed captain.

[24]   Kopp/NIA argue that absent affirmation from MGA's
underwriting guidelines, Terrier's testimony alone cannot
demonstrate that certain misrepresentations and omissions were
material.  Apart from the other reasons for denying Kopp/NIA's
Motion for Summary Judgment, as expressed above, MGA's
underwriting guidelines corroborate Terrier's testimony insofar
as the guidelines deem as "generally not eligible" for coverage
any "[y]achts owned by individuals who have had in the past five

Bolstering Terrier's assertions as to the application's significance are the quote itself and an e-mail dated June 23, 2006 from Terrier to Kopp.  The quote stated:

> This is a Quotation from the NEW HAMPSHIRE INSURANCE COMPANY, based on information supplied.  This does not represent that coverage is bound, or that price is final. Final price and binding coverage can only occur upon receipt of a fully completed and signed application.

Terrier's e-mail to Kopp further specified:

> This quote is subject to the following conditions prior to coverage being bound:
>
> * Receipt of a completed signed application
> * A Copy of the crew's resume if operating the vessel
> * The 1st. Years Itinerary

Together, these communications make clear that the quote was a preliminary, tentative determination subject to subsequent conditions, including the completion of a signed application, before coverage would be finalized and binding.[25]  Were the application to contain different information than that provided on the MGA website form, it is reasonable to suspect that NHIC

---

years more than two losses unless approved by MGA management." Because the December 2002 and August 2004 incidents both occurred within five years of Kopp's completion of the application, the non-disclosure of the August 2004 incident likely would have been relevant to Terrier's assessment.

[25]    According to Terrier, the MGA website cannot automatically provide a quote for a vessel valued above $250,000. When a broker seeks coverage online for such a vessel, a message replies, "Unable to Provide a Quote," and the broker then must confer with a marine underwriter to bind coverage.

and MGA may have revised its quote or have reassessed its decision to issue a policy altogether.  Moreover, both Diller and Kopp testified that they understood that NHIC and MGA would rely on information provided in the application to bind coverage.

Finally, an applicant's loss history is often material to an insurer's decision to issue a policy.  See, e.g., Certain Underwriters at Lloyd's v. Montford, 52 F.3d 219, 222 (9th Cir. 1995) ("An insurance applicant's loss history is a fact material to the risk."); Pinette v. Assurance Co. of Am., 52 F.3d 407, 411 (2d Cir. 1995) ("Common sense tells us that an applicant's prior loss history is material to a reasonable insurance company's decision whether to insure that applicant or determination of the premium."); Great Lakes Reins. PLC v. Arbos, 2008 U.S. Dist. LEXIS 109472, at **15-16 (S.D. Fla. Dec. 30, 2008) ("[A] prospective insured's loss history is undoubtedly material, as it might have a bearing on the risk to be assumed by the insurer, and no reasonable juror could find otherwise. . . .  [C]ourts have routinely found that an insurance applicant's loss history is a fact material to the risk."); Great Am. Ins. Cos. v. Subranni, 332 B.R. 690, 715 (Bankr. D.N.J. 2005) (noting materiality of loss history under New Jersey law).

Therefore, Kopp/NIA's Motion for Summary Judgment is denied. For the same reasons, Diller's Cross-motion for Partial Summary Judgment also is denied.

36

D.    **Kopp/NIA's Motion to Dismiss**

Kopp/NIA argue that Diller's third-party claims must be dismissed because, in contravention of N.J.S.A. 2A:53A-27, Diller failed to timely serve an affidavit of merit to Kopp/NIA in a professional malpractice action.  In support of their argument, Kopp/NIA contend that Diller's assertions challenge Kopp/NIA's professional conduct as licensed insurance brokers, thereby triggering N.J.S.A. 2A:53A-27's applicability.  Diller counters that no affidavit of merit is required because: (1) his third-party claims against Kopp/NIA are essentially extensions of NHIC's claims against Diller; (2) there is no need for expert testimony to prove that Kopp/NIA merely acted negligently and failed to procure coverage as Kopp/NIA were required to do; and (3) no case management conference was held to address the affidavit of merit.

1.    **Standard for Motion to Dismiss on the Pleadings**

A Rule 12(c) motion for judgment on the pleadings may be filed after the pleadings are closed.  Fed. R. Civ. P. 12(c); Turbe v. Gov't of V.I., 938 F.2d 427, 428 (3d Cir. 1991).  In analyzing a Rule 12(c) motion, a court applies the same legal standards as applicable to a motion filed pursuant to Rule 12(b)(6).  Turbe, 938 F.2d at 428.  Thus, a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff.  Evancho v. Fisher,

37

423 F.3d 347, 351 (3d Cir. 2005).

A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 n.8 (2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("The Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element.  This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." (quoting Twombly, 550 U.S. at 556)).  A court need not credit either "bald assertions" or "legal conclusions" in a complaint when deciding a motion to dismiss.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997).  The defendant bears the burden of showing that no claim has been presented.  Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005).

### 2.   Affidavit of Merit

Pursuant to N.J.S.A. 2A:53A-27,

> In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his

38

profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices.  The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.

Relevant to this case, the statute defines a "licensed person" as "any person who is licensed as . . . an insurance producer." N.J.S.A. 2A:53A-26(o).  It is undisputed that NIA/Kopp are licensed insurance brokers and that Diller has not provided NIA/Kopp with an affidavit of merit.

The purpose of the Affidavit of Merit statute, "as a tort reform measure," is to "weed out frivolous lawsuits at an early stage and to allow meritorious cases to go forward" by "requir[ing] a plaintiff in a malpractice case to make a threshold showing that the claims asserted are meritorious." Galik v. Clara Maass Med. Ctr., 771 A.2d 1141, 1147 (N.J. 2001). Courts have held that the Affidavit of Merit statute "applies to the filing of a third-party complaint when the cause of action pled requires proof of malpractice or professional negligence," Nagim v. N.J. Transit, 848 A.2d 61, 68 (N.J. Super. 2003); see McCrossan v. Wiles, 2004 U.S. Dist. LEXIS 17506, at *24 (E.D. Pa. Aug. 27, 2004), and also applies when New Jersey law is litigated

39

in federal court actions, <u>Snyder v. Pascack Valley Hosp.</u>, 303
F.3d 271, 273 (3d Cir. 2002).

    To determine whether the Affidavit of Merit statute applies
to a particular claim against a statutorily defined "licensed
person," a court must consider "three elements":

> (1) whether the action is for "damages for
> personal injuries, wrongful death or property
> damage" (nature of injury); (2) whether the
> action is for "malpractice or negligence"
> (cause of action); and (3) whether the "care,
> skill or knowledge exercised or exhibited in
> the treatment, practice or work that is the
> subject of the complaint [] fell outside
> acceptable professional or occupational
> standards or treatment practices" (standard of
> care).

<u>Couri v. Gardner</u>, 801 A.2d 1134, 1137 (N.J. 2002) (quoting N.J.S.A.
2A:53A-27).  With few exceptions, "failure to provide an affidavit
results in dismissal of the complaint."  <u>Id.</u>  In this case, Diller
seeks damages for Kopp/NIA's negligence in failing to procure proper
insurance for Diller's vessel.[26]  Diller, nevertheless, challenges

---

[26]    Diller also alleges breach of contract and breach of
fiduciary duty against Kopp/NIA.  To determine whether a cause of
action implicates the Affidavit of Merit statute, litigants and
the court need not concern themselves with the claim's
denomination or label, but rather "should determine if the
underlying factual allegations of the claim require proof of a
deviation from the professional standard of care for that
specific profession."  <u>Couri</u>, 801 A.2d at 1141.  Here, Diller
accuses Kopp/NIA of negligence, averring that Kopp failed to
exercise due care in procuring Diller insurance for his vessel by
improperly completing his insurance application to NHIC.  Diller
also alleges breach of contract against Kopp/NIA on account of
Kopp's failure to procure insurance and his improper completion
of the insurance application.  Finally, Diller's cause of action
for breach of fiduciary duty relies on the same underlying

the need for an affidavit of merit under these circumstances.

First of all, Diller contends that he need not serve an affidavit of merit to Kopp/NIA because his third-party claims are merely a "pass-through" of NHIC's claims against him.  To support his argument, Diller relies on Burt v. West Jersey Health Systems, 771 A.2d 683 (N.J. App. Div. 2001), and Diocese of Metuchen v. Prisco & Edwards, AIA, 864 A.2d 1168 (N.J. App. Div. 2005).  In Burt, the Appellate Division of the Superior Court of New Jersey "consider[ed] the interplay between the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.4, the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53-1 to -5, and the Affidavit of Merit Act, N.J.S.A. 2A:53A-27 to -29."  Burt, A.2d at 687.  To harmonize the statutes and to effectuate their purposes, the panel concluded that the absence of an affidavit of merit would not preclude a cross-claimant from pursuing the statutory right to contribution.  Id. at 688.

In Diocese, the defendant/third-party plaintiff filed a complaint against the third-party defendant, asserting claims for contribution, pursuant to the Joint Tortfeasors Contribution Law, and contractual and common law indemnification.  Diocese, 864 A.2d at 1170.  The Appellate Division held that the defendant did

factual allegations.  Therefore, if Diller was required to submit an affidavit of merit in relation to one of his causes of action against Kopp/NIA, he was required to submit affidavits of merit for the others as well.

not have to provide an affidavit of merit to the third-party defendant because the defendant's third-party claim was derivative of the plaintiff's professional negligence claims against the defendant and constituted "a true claim for contribution and for allocation of fault as among joint tortfeasors rather than independent claim of professional negligence." Id. at 1172.  Ultimately, the panel concluded: "[W]here a defendant subject to the Affidavit of Merit statute asserts a third-party claim in the nature of contribution or joint tortfeasor liability as against another professional also subject to the statute, no Affidavit of Merit is required." Id. at 1173.

Here, Diller is not seeking contribution or indemnification, but rather asserts affirmative claims for negligence, breach of contract, and breach of fiduciary duty.  Diller's third-party claims, therefore, do not implicate the statutory right of contribution.  Nor are Diller's claims tantamount to those brought by NHIC against Diller.  While NHIC must demonstrate that a material misrepresentation or omission voids its policy, Diller must further prove that any material misrepresentations or omissions voiding his policy were the proximate cause of Kopp/NIA's failure to exercise due care as an insurance broker. In other words, it is not enough for Diller merely to prove that Kopp/NIA misrepresented or omitted a material fact in the

application; Diller must also show that Kopp/NIA, exercising professional judgment, acted negligently in so doing.

Second, Diller argues that the Affidavit of Merit statute does not control in this case because no expert testimony is necessary to demonstrate that Kopp/NIA deviated from a professional standard of care.  According to Diller, Kopp/NIA failed to fulfill their basic task of procuring insurance for Diller, and to adjudicate that ordinary negligence, a jury or fact finder may rely on common knowledge.

An affidavit is not necessary where a plaintiff alleges ordinary negligence and does not question whether the defendant deviated from a professional standard of care.  Couri, 801 A.2d at 1141.  Accordingly, "an affidavit need not be provided in common knowledge cases when an expert will not be called to testify 'that the care, skill or knowledge . . . [of the defendant] fell outside acceptable professional or occupational standards or treatment practices.'"  Hubbard v. Reed, 774 A.2d 495, 497 (N.J. 2001) (quoting N.J.S.A. 2A:53A-27).  The common knowledge doctrine "applies where jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts."  Id. at 499 (citation and internal quotation marks omitted).  Therefore, a claim, whether in tort or contract,

necessitates an affidavit of merit "if the claim's underlying factual allegations require proof of a deviation from the professional standard of care applicable to that specific profession." Couri, 801 A.2d at 1141.

Analogous to the present matter, in Carolina Casualty Insurance Company v. Cryan's Ale House & Grill, 2009 U.S. Dist. LEXIS 15331 (D.N.J. Feb. 26, 2009), the plaintiff-insurer sought a judgment declaring that it need not defend or indemnify the defendants and that its insurance policy was void ab initio. Id. at **1-2. The insurer disputed the validity of the policy when it learned that the defendants, when applying for insurance, did not disclose a letter revealing a former employee's intent to sue the defendants. Id. at **3-5. In response to the insurer's suit, the defendants filed a third-party complaint against its insurance agent and his agency (collectively, "third-party defendants"), alleging negligence, professional negligence, and breach of fiduciary duty in relation to the agent's procurement of insurance for the defendants. Id. at *2. The third-party defendants filed motions to dismiss on the grounds that the defendants never provided an affidavit of merit. Id. at *14.

The Court found that the defendants' third-party claims centered around the third-party defendants' preparation of the insurance proposal form and their "alleged determination that the . . . Letter did not constitute a 'claim' for purposes of

44

preparing the Proposal and procuring . . . insurance." <u>Id.</u> at
*16.  Given the nature of the defendant's claims against the
third-party defendants, the Court held that all of the claims
"require proof that third-party defendants deviated from the
professional standard of care in preparing the Proposal on behalf
of [the defendants]." <u>Id.</u>

Further, the Court rejected the contention that the common
knowledge exception applied to save the defendants' failure to
provide an affidavit of merit. <u>Id.</u> at **17-18.  The common
knowledge exception was unavailable, surmised the Court, because
"defendants' predicate for liability is the manner in which
third-party defendants exercised professional responsibilities
and judgment in preparing the Proposal," and the exercise of such
professional judgment in preparing a proposal form for the
insurance at issue is "beyond the common knowledge of lay
persons." <u>Id.</u> at *17.

In many respects, the present matter mirrors the dispute in
<u>Carolina Casualty</u>.  Here, Diller challenges Kopp's professional
judgment insofar as Kopp read the "Loss History" section of the
insurance application to NHIC, in combination with the MGA
website form, as not requiring the disclosure of the February
2001 and August 2004 incidents.  Accordingly, the impetus for
Diller's suit against Kopp/NIA is largely contingent upon the
manner in which Kopp exercised his professional judgment in

45

preparing the application and attempting to procure insurance for

Diller.  Because the completion of the insurance application

implicated Kopp's professional responsibilities and judgment, the

common knowledge exception, as in <u>Carolina Casualty</u>, does not

apply here.[27]  <u>See</u> <u>id.</u> at *17 ("'[T]he common knowledge exception

is unavailable where . . . the alleged malpractice concerns

licensed professionals who were exercising their professional

responsibility and judgment.'" (quoting <u>Acosta v. Pace Local I-

300 Health Fund</u>, 2007 U.S. Dist. LEXIS 9464, at *20 (D.N.J. Feb.

8, 2007))).  This is not a case in which Kopp/NIA's negligence --

the alleged misinterpretation of an insurance application and its

terms -- is entirely discernible by the ordinary understanding

and experience of jurors.[28]  <u>See</u> <u>id.</u> ("Errors in judgment made in

_____

[27]     Diller attempts to distinguish <u>Carolina Casualty</u> by
suggesting that the completion of a proposal form for employment
practices liability insurance appears to be more complicated than
the completion of the marine insurance application submitted to
NHIC.  For that reason, Diller opines that, in contrast to the
broker in <u>Carolina Casualty</u>, Kopp did not have to exercise his
professional expertise.  Without more, the Court finds this
assertion unavailing.  <u>Cf.</u> <u>Dreiling v. Maciuszek</u>, 780 F. Supp.
535, 540 (N.D. Ill. 1991) ("Marine insurance is such a speciality
that the use of brokers by vessel owners is not only very general
but almost necessary for the benefit of the insured owners . . .
.").

[28]     That Diller asserts that he "does not intend to provide
evidence that Kopp and NIA deviated from the standard of care
customary for insurance brokers" does not, in and of itself,
render the affidavit of merit requirement inapposite.  "In a
common knowledge case, whether a plaintiff's claim meets the
threshold of merit can be determined on the face of the
complaint."  <u>Palanque v. Lambert-Woolley</u>, 774 A.2d 501, 506 (N.J.
2001); <u>see</u> <u>Carolina Cas.</u>, 2009 U.S. Dist. LEXIS 15331, at *18

preparing such a proposal form differ from situations where the
defendant's negligence is obvious, such as a doctor pulling out
the wrong tooth, a doctor misreading a laboratory report, or a
pharmacist filing a prescription with the wrong medication."); 
see also, e.g., Boerger v. Commerce Ins. Serv., 2005 U.S. Dist.
LEXIS 26350, at *10 (D.N.J. Nov. 1, 2005) (no affidavit of merit
required where insurance broker misrepresented amount of
insurance coverage available to plaintiff).

Finally, in the event that the Affidavit of Merit statute
were applicable here, Diller submits that this Court not enforce
the statutory requirement because, contrary to the ruling by the
Supreme Court of New Jersey in Ferreira v. Rancocas Orthopedic
Associates, 836 A.2d 779 (N.J. 2003), no case management

---

("Applicability of the common knowledge exception . . . is
determined based on the allegations in the complaint.").
    Further, Diller cites a series of cases for the proposition
that a broker's failure to procure insurance does not require
expert testimony.  See, e.g., Bates v. Gambino, 370 A.2d 10 (N.J.
1977); Indus. Dev. Assoc. v. F.T.P., Inc., 591 A.2d 682 (N.J.
App. Div. 1991); DiMarino v. Wishkin, 479 A.2d 444 (N.J. App.
Div. 1984).  However, all of these cases predate the adoption of
the Affidavit of Merit statute in 1995 and are distinguishable
from the present matter, arguably presaging the common knowledge
exception.  See, e.g., Bates, 370 A.2d 10 (broker lacked
knowledge of rules governing an insurance policy and its
availability); Indus. Dev. Assoc., 591 A.2d 682 (broker
misrepresented that a building's sprinkler system was
operational); DiMarino, 479 A.2d 444 (broker agreed to procure
insurance but did not inform client when he failed to do so).
Moreover, to hold that the Affidavit of Merit does not apply
whenever an insurance broker fails to procure insurance would
virtually eliminate any protection that the statute is intended
to afford "insurance producers."  N.J.S.A. 2A:53A-26(o).

conference was held to address the issue.  Since they filed their Answer to Diller's third-party complaint in May 2007, adds Diller, Kopp/NIA have never complained about the absence of an affidavit of merit.

In Ferreira, the New Jersey Supreme Court directed that, to avoid harsh rigidity and "to shepherd legitimate claims expeditiously to trial," an "accelerated case management conference be held within ninety days of the service of an answer in all malpractice actions." Id. at 785.  In spite of this directive to New Jersey state courts, Diller does not present any case law to support his contention that case management conferences, which are procedural in nature, must be utilized in federal court however beneficial.  Moreover, even if case management conferences were required in federal courts to address disputes over affidavits of merit, the Court is not convinced that Diller's obligation to serve an affidavit is excused merely because no case management conference occurred.  See Paragon Contractors, Inc. v. Peachtree Condo. Ass'n, 968 A.2d 752, 761 (N.J. App. Div. 2009) (rejecting argument that failure to schedule case management conference should toll the statutory period to provide an affidavit of merit or otherwise excuse the failure to provide an affidavit).

For the foregoing reasons, the Court will dismiss Diller's third-party claims against Kopp/NIA.  However, that does not end

the Court's analysis.

Although Diller's failure to provide an affidavit of merit warrants dismissal at this time, the Court is convinced that principles of equity and fairness demand that Diller be granted an opportunity to re-file his complaint if he is now able to provide the required Affidavit of Merit.  In a supplemental brief, denominated as a Motion for Leave to File a Sur-reply and Affidavit, Diller highlights Bruen v. Morristown Memorial Hospital, 2009 N.J. Super. Unpub. LEXIS 1466 (N.J. App. Div. Jun. 15, 2009), a recent opinion by the New Jersey Appellate Division. In that case, the appellate panel denied a defendant's motion to dismiss due to the doctrines of equitable estoppel and laches, ultimately concluding that, to the plaintiff's detriment, the defendant delayed in asserting its objection to the plaintiff's failure to provide an affidavit of merit and, thus, could not rely on that failure to dismiss the case.  Id.

Given Kopp/NIA's delay in voicing concern over the lack of an affidavit in this case, Diller submits that equitable estoppel and laches should apply to save Diller's third-party claims here. Kopp/NIA argue that the Court should not consider Diller's sur-reply and, alternatively, that Bruen is distinguishable because, unlike in that case, Diller never furnished any expert submission illustrating his case's merit.  In addition, Kopp/NIA assert that the Affidavit of Merit statute does not have a time limit as to

49

when a party may seek dismissal for want of an affidavit.

First, to the extent that Diller's supplemental submission may constitute a motion for leave to file a sur-reply, the Court, in the interests of justice, will grant it and consider Diller's letter-brief which has already been submitted to the Court.[29] Along with presenting a meritorious argument, Diller's motion brings to this Court's attention a recent Appellate Division opinion and expounds upon an issue addressed in part in Diller's initial opposition brief -- i.e., Kopp/NIA's failure to raise the lack of an affidavit of merit as a concern in a timely manner. Accordingly, Diller's argument will be heard.

Second, considering Diller's argument on the merits and the unique circumstances of this case, principles of equity and fairness dictate that Diller have an opportunity to file an affidavit of merit against Kopp/NIA.  Although the Court recognizes that Bruen is unpublished and is not binding precedent, the Appellate Division's opinion in that case, nevertheless, reasonably relies on the well-established doctrines of equitable estoppel and laches, and is consistent with settled New Jersey precedent.  See, e.g., Knorr v. Smeal, 836 A.2d 794

---

[29]   Diller challenges Kopp/NIA's assertion that its letter-brief even constitutes a sur-reply, but nonetheless submitted the Motion for Leave to File a Sur-reply and Affidavit.  With that said, Local Rule 7.1(d)(6) provides: "No sur-replies are permitted without permission of the Judge or Magistrate Judge to whom the case is assigned."

(N.J. 2003) (denying defendant's motion to dismiss due to plaintiff's failure to timely file an affidavit of merit because, subject to the doctrines of equitable estoppel and laches, defendant delayed in seeking dismissal and participated in discovery).  This Court, however, need not rely expressly or exclusively upon equitable estoppel or laches to find that, at this juncture, the dismissal, with prejudice, of Diller's third-party claims for failure to have served an affidavit of merit would be unfair and contrary to the purpose of the Affidavit of Merit statute.

As noted earlier, the purpose of the Affidavit of Merit statute is "to flush out insubstantial and meritless claims that have created a burden on innocent litigants and detracted from the many legitimate claims that require the resources of our civil justice system."  Ferreira, 836 A.2d at 784.  Thus, "[t]he statute was not intended to encourage gamesmanship or a slavish adherence to form over substance," nor "to reward defendants who wait for a default before requesting that the plaintiff turn over the affidavit of merit."  Id. at 784-85.

Here, Kopp/NIA filed their Answer to the third-party complaint in May 2007, a Motion for Summary Judgment against Diller in November 2007, and an Amended Answer to the amended third-party complaint in January 2008.  They also took part in a Scheduling Conference, the federal functional equivalent to a

case management conference, before the Magistrate Judge on July
11, 2007 -- as Diller noted in his initial opposition brief --
and participated in extensive discovery.  Nevertheless, Kopp/NIA
did not file the present Motion to Dismiss until December 2008,
approximately eighteen months after they first filed their Answer
to Diller's third-party complaint.[30]  Therefore, Kopp/NIA required
the parties to expend substantial time and expense, and the Court
to invest its judicial resources, before finally affirmatively
questioning Diller's failure to provide an affidavit of merit.
That this Court may not adhere to New Jersey's case management
guidelines did not preclude Kopp/NIA from alerting Diller or the
Court of Diller's deficiency sooner so that Diller could have
attempted to comply with the statute or the Court could have
otherwise acted.  Under these unique circumstances, to
definitively bar Diller's potentially meritorious third-party
claims would serve to undermine the purpose of the Affidavit of
Merit statute.

Therefore, because Diller did not file an affidavit of
merit, the Court must dismiss his third-party claims against

---

[30]   Kopp/NIA argue that the relevant time is when they
filed their Amended Answer, not their initial answer.  However,
as Diller points out, the amended third-party complaint only
sought to add Mann to the litigation as a third-party defendant.
Diller's initial complaint already put Kopp/NIA on notice of the
claims asserted by Diller against them.  Accordingly, Kopp/NIA
would have known at the time of the initial complaint that
Diller's claims against them required an affidavit of merit.

Kopp/NIA.  However, because Kopp/NIA did not act in a timely
fashion in regards to the lack of an affidavit, the Court deems
it appropriate to dismiss Diller's third-party claims without
prejudice, thereby affording Diller sixty (60) days to re-file
his complaint against and to serve an affidavit of merit on
Kopp/NIA.  If Diller fails to re-file his complaint and to
satisfy the affidavit of merit requirement within the specified
period, Diller will be barred from raising the third-party action
against Kopp/NIA entirely.[31]

---

[31]    The Court recognizes that ordinarily dismissal for
failure to abide by the Affidavit of Merit statute should be with
prejudice.  Indeed, the statute deems such a deficiency to be a
failure to state a claim.  N.J.S.A. 2A:53A-29.  While the
judicial doctrines of equitable estoppel and tolling seek to
ameliorate the harshness of such a result, to apply those
doctrines in such a way as to completely eliminate the affidavit
of merit requirement in all cases of defendant delay would seem
to unnecessarily undermine the legislative purpose.  Courts of
equity should not be so inflexible nor does it appear that New
Jersey courts would deny to themselves some middle ground in such
cases.  In addressing the Affidavit of Merit statute, New Jersey
courts have held that, where exceptional circumstances exist, the
failure to serve an affidavit in accordance with the statute may
warrant the dismissal of the plaintiff's claims <u>without</u>
prejudice.  <u>See, e.g.</u>, <u>Tischler v. Watts</u>, 827 A.2d 1036, 1038
(N.J. 2003); <u>Barreiro v. Morais</u>, 723 A.2d 1244, 1249-50 (N.J.
App. Div. 1999).  The dismissal without prejudice, in essence,
serves to equitably toll the time within which the plaintiff
could serve an affidavit of merit.  <u>See</u> <u>Barreiro</u>, 723 A.2d at
1249-50 ("In the event the court concludes extraordinary
circumstances existed, plaintiffs shall be afforded such time,
from the ensuing order dismissing the complaint without
prejudice, to file a new complaint with an appropriate Affidavit
of Merit as if the statute of limitations had been tolled when
the order under appeal was entered.").
    Although dismissal without prejudice may be unusual, given

## IV.   CONCLUSION

For the foregoing reasons, NHIC's Motion for Summary Judgment is denied; Kopp/NIA's Motion for Summary Judgment is denied; and Diller's Cross-motion for Partial Summary Judgment is denied. Diller's Motion for Leave to File a Sur-reply is granted. Kopp/NIA's Motion to Dismiss is granted.  However, such dismissal is without prejudice under the following conditions.  Diller has sixty (60) days to re-file his third-party complaint against Kopp/NIA (which will relate back to his earlier pleadings) and to file an affidavit of merit in this case.  If Diller fails to act in accordance with this Opinion, his third-party claims against Kopp/NIA will be barred entirely.  An Order consistent with this

---

the circumstances of this case, the Court finds that such a resolution here best serves the laudable legislative goals of the Affidavit of Merit statute: to eliminate frivolous lawsuits levied against licensed professionals and at the same time to facilitate meritorious claims so that plaintiffs may have their opportunity in court.  By dismissing this case, the Court recognizes the current deficiency in Diller's third-party suit and requires that he demonstrate his claims' validity in accordance with the Affidavit of Merit statute.  At the same time, by dismissing without prejudice, the Court does not reward Kopp/NIA for sitting on their rights and, in turn, allows Diller an opportunity to pursue a potentially meritorious claim.  While this Court must abide by the substantive law of New Jersey applicable here, the Court also has the plenary authority, and the solemn responsibility, to apply the federal rules of civil procedure to afford fair play and substantial justice and to foster resolutions on the merits.  Therefore, the Court concludes that dismissal of Diller's third-party claims without prejudice is the appropriate result given the unique facts and circumstances of this case.

Opinion will be entered.


Dated: <u>January 13, 2010</u>                    <u>  /s/ NOEL L. HILLMAN     </u>
At Camden, New Jersey                    NOEL L. HILLMAN, U.S.D.J.